SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
CHRISTOPHER L. AYERS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone: 973/639-9100
cseeger@seegerweiss.com
cayers@seegerweiss.com

Liaison Counsel

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re NOVO NORDISK A/S SECURITIES LITIGATION | No. 3:25-cv-00713-RK-JBD |
| | <u>CLASS ACTION</u> |
| This Document Relates To: | Judge Robert Kirsch |
| ALL ACTIONS. | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.   NATURE AND SUMMARY OF THE ACTION ........................................1

II.  JURISDICTION AND VENUE....................................................................6

III. PARTIES ....................................................................................................7

    A.   Plaintiffs ..........................................................................................7

    B.   Defendants........................................................................................8

        1.   Corporate Defendant............................................................8

        2.   Individual Defendants..........................................................9

IV.  BACKGROUND .......................................................................................11

    A.   Company Overview..........................................................................11

    B.   GLP-1 Drugs Discovered as Treatment for Obesity..........................12

        1.   Longstanding Need for Obesity Treatment that Works............12

        2.   Novo's GLP-1 Weight Loss Discovery Triggered a
            Market Frenzy .....................................................................12

        3.   Driven by the Obesity Market, Novo Quickly Became the
            Largest Company in Europe ......................................................13

    C.   Lilly's Entrance into the Obesity Market Created an Arms Race ......14

    D.   Novo Identified CagriSema as the Solution.........................................15

    E.   CagriSema's Road to Approval............................................................17

    F.   The REDEFINE 1 Study ....................................................................18

V.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND
    OMISSIONS ISSUED DURING THE CLASS PERIOD ............................19

**Page**

VI.     THE TRUTH IS REVEALED ........................................................43

VII.    ADDITIONAL EVIDENCE OF SCIENTER ...............................51

    A.    Defendants Admitted to Designing a Flexible Dosing Protocol Because of Tolerability Concerns ......................................51

    B.    Defendants Disclosed Flexible Dosing Protocols in Other GLP-1 Trials....................................................................52

    C.    Defendants Identified Lange as the Best Source of Information for CagriSema Trial Design .................................52

    D.    CagriSema Is a Core Product Crucial to Novo's Future....................58

    E.    Jørgensen's Abrupt and Suspicious Departure Supports Scienter......59

    F.    Novo's Intra-Class Period Financings Incentivized Fraud .................60

    G.    Pressure from Shareholders to Elevate Share Price Incentivized Fraud.....................................................................61

    H.    Defendants' Insider Trading Incentivized Fraud ................................62

VIII.   LOSS CAUSATION ....................................................................64

IX.     NO SAFE HARBOR ...................................................................67

X.      APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE .........................................68

XI.     PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................70

COUNT I (Against All Defendants for Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder) ............................................72

COUNT II (Violations of §20(a) of the Exchange Act Against All Defendants)...................................................................74

PRAYER FOR RELIEF ................................................................76

**Page**

DEMAND FOR TRIAL BY JURY ...........................................................................76

4899-9815-3293.v2

Co-Lead Plaintiffs New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund, Pavers & Road Builders District Council Pension Fund, and City of Kissimmee General Employees' Retirement Plan (collectively, "Plaintiffs"), by their undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs' own acts and information and belief as to all other matters. Plaintiffs' information and belief are based on, among other things, the independent investigation conducted by and through Plaintiffs' attorneys. The investigation includes, among other things, a review and analysis of: (i) Novo Nordisk A/S's ("Novo" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"); (ii) transcripts of Novo's conference calls with investors and analysts; (iii) press releases disseminated by Novo; (iv) media reports concerning Novo; (v) analyst reports issued about Novo and its competitors; and (vi) other information obtained on the internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action brought by Plaintiffs individually and on behalf of all persons and entities who purchased or otherwise acquired Novo American Depository Receipts ("ADRs") between November 2, 2022 and December 19, 2024, inclusive (the "Class Period"), and were damaged thereby, against Novo, its

- 1 -

former Chief Executive Officer ("CEO") Lars Fruergaard Jørgensen ("Jørgensen"), and its Executive Vice President of Development Martin Holst Lange ("Lange") (collectively "Defendants") for violations of §10(b) and §20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.     Novo is a global healthcare company which, together with its subsidiaries, engages in the research and development, manufacture, and distribution of pharmaceutical products.  Since 2018, Novo has been engaged in intense competition with Eli Lilly ("Lilly") to develop the most effective and tolerable glucagon-like peptide-1 ("GLP-1") prescription drugs.  GLP-1 drugs have rapidly gained international popularity for treatment of both diabetes and, more recently, obesity.  The obesity application is particularly important as GLP-1 drugs represent the most effective treatment for obesity in history and a potential solution to a global health crisis.  Securities analysts forecast the obesity market to reach $150 billion by the early 2030s.

3.     Novo's most prominent GLP-1 drug is semaglutide.  Novo brands semaglutide as Ozempic for diabetes and Wegovy for weight loss, but (as Novo explained in its marketing materials) the brands are identical, and patients taking Ozempic have experienced weight loss.  Ozempic and Wegovy both hit the market before Lilly's GLP-1 drugs (in 2018 and 2021, respectively), and obtained immense

- 2 -

initial success.  In 2022 and 2023, Lilly's tirzepatide followed Novo's products into the market.  Tirzepatide is branded as Mounjaro for diabetes and Zepbound for weight loss.  Mounjaro and Zepbound proved more effective than Ozempic and Wegovy at treating obesity, and Lilly quickly began taking market share from Novo.  Specifically, clinical trials demonstrated that tirzepatide caused weight loss of 22.5%, exceeding semaglutide's 14% weight loss.  By late 2022, though Ozempic remained the most popular GLP-1 by total prescriptions, Mounjaro surpassed Ozempic in new-to-brand prescriptions.

4.    In response to pressure from Lilly, Novo pointed investors to a new weight loss candidate – CagriSema (a combination of cagrilintide and semaglutide).  Novo informed investors that it expected CagriSema to produce 25% weight loss in patients, making it more effective than Lilly's drugs.  By the start of the Class Period, CagriSema's Phase I and Phase II clinical trials were completed, and only Phase III clinical trials – the last barrier to marketability – remained.  Novo explained to the market that the 25% weight loss Phase III target was based on data gathered from CagriSema Phase I and Phase II studies.  Novo also explained that the Phase I and Phase II data indicated that CagriSema had a "safe and well-tolerated profile."  Investors became focused on CagriSema, viewing it as crucial to Novo staying competitive with Lilly.  As a securities analyst noted during an August 3, 2022 earnings call, "with Wegovy relaunches [] potentially only coming a few months

- 3 -

ahead of tirzepatide in obesity . . . the Cagri[S]ema time lines are becoming increasingly important."

5.      On the first day of the Class Period, November 2, 2022, Novo announced that it initiated CagriSema's Phase III clinical trial for an obesity indication, naming the Phase III trial "REDEFINE 1."  During the Class Period, Defendants described REDEFINE 1 as testing a "fixed dose combination" of CagriSema – *i.e.*, 2.4 milligram ("mg") cagrilintide and 2.4 mg semaglutide.  For example, Novo repeatedly presented the slide below, informing investors that REDEFINE 1 utilized a fixed dose (2.4 mg cagrilintide and 2.4 mg semaglutide) of CagriSema:



- 4 -

6.    The Company's public description of REDEFINE 1 on ClinicalTrials.gov similarly represented that "[p]articipants will receive 2.4 mg cagrilintide and 2.4 mg semaglutide."

7.    But the truth was that no patients were required to take a fixed dose 2.4 mg cagrilintide and 2.4 mg semaglutide of CagriSema. Instead, Defendants designed REDEFINE 1 with a *flexible* dosing protocol from the outset, meaning patients could modify their dosing to whatever level was tolerable to each patient. Defendants withheld this fact from investors until announcing initial REDEFINE 1 results on December 20, 2024, when they admitted that REDEFINE 1 was designed to allow "patients to modify their dosing throughout the trial." As a result, only 57.3% of patients treated with CagriSema received the dose Defendants described throughout the Class Period. Ultimately, the REDEFINE 1 participants treated with CagriSema achieved a weight loss of only 20.4%, falling well short of Novo's 25% weight loss expectation and Lilly's proven 22.5% benchmark for Zepbound. In response to Novo's December 20, 2024 disclosure, the price of Novo's ADRs fell nearly 18%.

8.    Securities analysts expressed their disappointment at the weight loss results and were concerned by the previously undisclosed flexible dosing protocol, including its implications on CagriSema's tolerability. An analyst at ABG Sundal Collier observed: "The data was clearly below the ~25% weightloss level that Novo had talked about achieving ahead of the readout. However the main problem was the

- 5 -

flexible trial protocol which allows patients to adjust its dosing" and "we still don't know what the drug can actually achieve."  A BMO Capital Markets analyst concluded: "Limits for patients attempting to reach the maximum dose raise questions around tolerability."  A Barclays analyst even questioned: "Did Novo design the trial this way to avoid potential tolerability issues?"

9.    Novo provided more detail on REDEFINE 1 during its February 5, 2025 earnings call.  Defendants conceded that Novo intentionally implemented a flexible dosing protocol in response to CagriSema Phases I and II tolerability data, specifically to "balance efficacy, tolerability, and trial dropout."

## II.    JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

12.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Novo maintains its United States headquarters in Plainsboro, New Jersey, which is situated in this District, and a substantial part of the acts and conduct that constitute the violations of law complained of herein, including the

preparation and/or dissemination to the public of materially false and misleading information, occurred in this District.

13.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communication, and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

14.    Co-Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund ("New York") is a multi-employer pension plan with approximately $1.7 billion of assets, providing health, pension and other benefits to over 90,000 union members, dependents, and retirees of the New York City hotel industry.  As set forth in its previously filed certification, New York acquired Novo ADRs at artificially inflated prices during the Class Period and was damaged thereby. ECF 16-4 at 2-3; ECF 16-5.

15.    Co-Lead Plaintiff Pavers & Road Builders District Council Pension Fund ("Pavers & Road Builders") is a multi-employer defined benefit fund with more than $300 million in assets under management operated for the benefit of thousands of participants, pensioners, and beneficiaries.  As set forth in its previously filed

certification, Pavers & Road Builders acquired Novo ADRs at artificially inflated prices during the Class Period and was damaged thereby.  ECF 16-4 at 4-5; ECF 16-5.

16.    Co-Lead Plaintiff City of Kissimmee General Employees' Retirement Plan ("Kissimmee") is a public pension fund with approximately $130 million in assets that provides benefits to all full-time employees of the city of Kissimmee, Florida.  As set forth in its previously filed certification, Kissimmee acquired Novo ADRs at artificially inflated prices during the Class Period and was damaged thereby. ECF 16-4 at 6-7; ECF 16-5.

### B.    Defendants

#### 1.    Corporate Defendant

17.    Defendant Novo Nordisk A/S is a Danish corporation with its United States principal executive offices located at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  The business activities of Novo were first established between 1923 and 1925, and centered on the sale of insulin for the treatment of diabetes.  The entity Novo Nordisk A/S was formed around 1989 by the merger of Nordisk Gentofte A/S and Novo Industri A/S.  During the Class Period, Novo's drug sales generated tens of billions in revenue in the United States, including over $42 billion in 2024.  Throughout the Class Period, Novo's sponsored ADRs were listed and traded on the New York Stock Exchange ("NYSE") under the ticker "NVO."

### 2.    Individual Defendants

18.     Defendant Jørgensen served as Novo's President, CEO and a member of Novo's Management Board throughout the Class Period.  Jørgensen joined Novo in 1991 and was appointed to President and CEO in January 2017.  Throughout the Class Period, Jørgensen was a member of executive management and served as a member of the management board, which ensured that Novo personnel executed Novo's strategies.  In May 2025, Novo's Board of Directors announced that it had fired Jørgensen, pointing to recent market challenges and the precipitous decline of the Company's share price beginning in the latter half of 2024.  Jørgensen's ouster came at the request of Novo's largest shareholder, the Novo Nordisk Foundation.  During the Class Period, Jørgensen sold 215,900 Novo Class B shares for $26,026,620 in proceeds.

19.     Defendant Lange served as Executive Vice President of Development and as a member of Novo's Management Board, Research Portfolio, and Product Development Committees.  Lange first joined Novo in 2002.  Between 2006 and 2008, Lange worked for Novo USA in the medical department as a senior medical director.  In January 2018, Lange was appointed as Senior Vice President of Global Development and assumed overall clinical development responsibilities of Novo's product pipeline.  Since January 2018, Lange has interacted with the United States Food and Drug Administration ("FDA") with regard to design and status of Novo's

- 9 -

clinical trials.  In March 2021, Lange was appointed to Executive Vice President of Development.  As Executive Vice President of Development, Lange continued to be in charge of Novo's overall clinical development responsibilities, including the conduct of clinical trials and project management.  Throughout the Class Period, Novo and members of its Senior Management held Lange out to investors as the person who was most capable of answering all "key" questions regarding the design of Novo's clinical studies, including REDEFINE 1 and all other CagriSema clinical studies.  During the Class Period, Lange sold 33,000 Novo Class B shares for proceeds of $3,628,215.

20.    Defendants Jørgensen and Lange are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Novo's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each of the Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

- 10 -

representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

21.    Novo is liable for the acts and omissions of the Individual Defendants, and its employees under the doctrines of *respondeat superior* and agency, as all the unlawful acts alleged herein were carried out within the scope of their employment with the authorization of the Company.  Further, the Individual Defendants' intent to deceive the public and investors is imputed to Novo under the doctrines of *respondeat superior* and agency.

## IV.    BACKGROUND

### A.    Company Overview

22.    Established in 1923, Novo is a global healthcare company long known as a world leader in diabetes care.  Today, the Company has one of the broadest diabetes product portfolios in the industry, including new generation insulin, a full portfolio of modern insulin, and human insulin.

23.    Novo added GLP-1 drugs to its portfolio in 2010.  GLP-1 medications work by mimicking the body's naturally-occurring GLP-1 hormone, which stimulates insulin secretion.  The drugs proved effective at treating diabetes, and therefore became a focus of research and development for Novo and its competitors.

**B.    GLP-1 Drugs Discovered as Treatment for Obesity**

24.     As GLP-1 drugs rose to prominence in treating diabetes, in 2014, a new application for the drug emerged.  Obese patients using GLP-1 drugs for diabetes treatment reported increased satiety, reduced food intake, and weight loss.  As a result, pharmaceutical companies, including Novo, launched studies designed to demonstrate that GLP-1 drugs led to significant weight loss in the obese population.

**1.    Longstanding Need for Obesity Treatment that Works**

25.     Obesity is a chronic, relapsing, and progressive disease associated with serious complications and comorbidities including heart disease, liver disease, and certain cancers.  The incidence of obesity continues to increase.  Today, one in eight people are living with obesity.  The United States is the epicenter of the crisis, with two out of every five adults suffering from the disease.  As obesity spread throughout the world, so too did a need for a serious solution.

**2.    Novo's GLP-1 Weight Loss Discovery Triggered a Market Frenzy**

26.     In 2017, Novo launched a new GLP-1 drug, semaglutide.  Novo initially sold semaglutide under the brand name Ozempic as a treatment for diabetes.  By 2018, Novo launched clinical research to test semaglutide's effectiveness in reducing obesity and increasing weight loss.  The results of the trial, which Novo called "STEP 1," were published in February 2021 and confirmed that obese patients taking

- 12 -

semaglutide experienced 14% weight loss on average. The FDA approved Novo's application to market semaglutide for obesity, and Novo rebranded the drug as Wegovy.

27.    But even before Wegovy was approved, patients began taking Ozempic for off-label treatment of obesity. Novo attempted to capitalize on the off-label use, suggesting in its Ozempic commercials that many people who took the drug lost weight. By the time Wegovy launched in 2021, there was worldwide excitement about semaglutide as a "'miracle drug'" for weight loss.

### 3.    Driven by the Obesity Market, Novo Quickly Became the Largest Company in Europe

28.    By 2024, Novo's GLP-1 drug sales skyrocketed to over $31 billion annually, including $17.5 billion of Ozempic and $8.4 billion of Wegovy. In total, GLP-1 medications made up more than 70% of Novo's sales in 2024. And GLP-1 sales are only expected to grow, as the obesity drug market is forecasted to reach $150 billion annually by the early 2030s.

29.    The once modest diabetes company from Denmark suddenly became an obesity powerhouse and the largest company in all of Europe by market capitalization. GLP-1 drugs propelled a nearly five-fold increase in Novo's market capitalization over the course of a single decade: from $101 billion in 2013 to $461 billion in 2023.

- 13 -

C.    **Lilly's Entrance into the Obesity Market Created an Arms Race**

30.    While Novo was the first company to gain marketing approval for a GLP-1 drug in obesity, Lilly was in hot pursuit of market share. In May 2022, Lilly launched its new GLP-1 drug tirzepatide (branded as Mounjaro to treat diabetes). In June 2022, Lilly published a study demonstrating that participants on the highest dose of tirzepatide lost 22.5% of their body weight on average. Tirzepatide's weight loss efficacy represented a significant improvement over Novo's Ozempic and Wegovy. Tirzepatide also demonstrated improved tolerability, leading experts and analysts to forecast that tirzepatide could garner nearly one quarter of the obesity market share within three years and potentially become the best-selling drug of all time. In November 2023, the FDA approved tirzepatide for treatment of obesity, and Lilly launched the drug under the brand name Zepbound the following month.

31.    Lilly was simultaneously developing another experimental weight loss drug – retatrutide. Retatrutide is designed to stimulate production of the GLP-1 hormone along with other hormones associated with increased satiety and weight loss. At the beginning of the Class Period, retatrutide was in a Phase II study and would soon be entering a Phase III study. In June 2023, Lilly announced the results of retatrutide's Phase II study, demonstrating that patients lost up to 24.2% of their weight after 48 weeks of treatment. In June 2023, Jeffries analysts noted that these trial results "set a high bar" for Lilly's competition, *i.e.*, Novo.

- 14 -

32.     As the Class Period progressed, Lilly sponsored a head-to-head weight loss trial between Novo's Wegovy and Lilly's Zepbound. The results, announced in December 2024, showed that, over 72 weeks, on average, Zepbound yielded 20% weight loss compared to Wegovy's 14%. The results reinforced findings from separate studies of the two drugs, confirming that Novo's existing drugs could not compete with Lilly's.

### D.    Novo Identified CagriSema as the Solution

33.     After Lilly's strong showing with tirzepatide, Novo needed a new drug that could maintain market share. In response to this pressure, Defendants pointed to the next drug in Novo's GLP-1 pipeline – CagriSema. CagriSema is a combination of cagrilintide, an amylin analogue that increases satiety, and semaglutide, the Ozempic and Wegovy GLP-1 drug. Defendants expected the combination drug to prove more effective than semaglutide alone.

34.     Securities analysts repeatedly opined that CagriSema needed to exceed the efficacy of Lilly's drugs for Novo to maintain market share. On June 26, 2023, a Jeffries analyst covering Novo noted that CagriSema needed to demonstrate better efficacy than Mounjaro in order to "play a role in the next treatment wave" for obesity therapies. A December 12, 2023 BNP Paribas report noted that "[w]ith [Eli] Lilly currently launching Zepbound, supported by data showing superior weight loss (~20%) to Novo's Wegovy (~15%), we believe successful development of Novo's

next generation agent CagriSema is key to it maintaining the market leadership that is implied in consensus forecasts." In an October 3, 2024 report, UBS Global Research emphasized that "25% weight loss is the threshold set by Novo to be seen as differentiated vs Lilly's Zepbound which showed 22.5% weight loss in the SURMOUNT-1 P3 study."

35. Novo was also motivated to demonstrate that it could reduce side effects and other tolerability issues that had plagued prior GLP-1 drugs. As noted in the American Diabetes Association's Standards of Medical Care in Diabetes - 2022, "tolerability issues are important considerations" in GLP-1 use. During conference calls, securities analysts confronted Novo directly about its ability to demonstrate better tolerability than Lilly in its Phase III CagriSema studies. For example, during the Company's November 3, 2022 Q3 2022 earnings call, a UBS Investment Bank analyst asked "[a]nd then on CagriSema, the tolerability in the Phase II, I think, at – it was 60-something percent of tolerability and I think discontinuation is up to 20%. Lilly has managed to get that down in Phase III. Just wondering what you can do in Phase III to get a better tolerability." A December 20, 2024 William Blair report highlighted that "the most significant unmet medical need in the obesity space is the ability to maintain patient adherence to GLP-1-based therapies."

E.    **CagriSema's Road to Approval**

36.    Prior to FDA approval, drugs typically progress through three clinical trial phases.  Phase I trials usually involve fewer than 100 healthy participants and are designed to test the safety profile of the investigational medication over a short period of time.  Phase II trials are generally longer in duration and test the medication's efficacy and side effects on a larger population of trial participants.  Phase III trials typically compare the efficacy of the investigational medication to existing medications or a placebo and can last for years and involve thousands of participants.

37.    In July of 2018, Novo began its 20-week Phase I CagriSema trial, "A Research Study of How NNC0174-0833 Taken With Semaglutide Works in People Who Are Overweight or Obese," investigating the safety, tolerability, and weight loss potential of the drug.  The study used a "multiple-ascending dose" protocol.  In the experimental arm of the study, participants were randomly assigned to receive a fixed dose of either 0.16 mg, 0.3 mg, 0.6 mg, 1.2 mg, 2.4 mg, or 4.5 mg of cagrilintide in combination with 2.4 mg of semaglutide once-weekly over the course of four weeks. The doses were escalated incrementally over the first 16 weeks of the trial, with each participant ultimately receiving their assigned fixed target dose for four weeks.  On June 18, 2020, Novo announced it had successfully completed the Phase I trial, and that, after 20 weeks of treatment, participants receiving the highest dose lost an average of 17.1% of their body weight.

38.    In 2021, Novo began its Phase II trial, "Research Study to Look at How Well Cagrilintide Together With Semaglutide Works in People With Type 2 Diabetes," which assessed the efficacy and safety of a fixed dose combination of CagriSema (2.4 mg cagrilintide and 2.4 mg semaglutide) relative to the individual components 2.4 mg cagrilintide and 2.4 mg semaglutide in 92 participants diagnosed as overweight with Type 2 Diabetes.  Participants gradually increased their dose until they reached the target dose of 2.4 mg cagrilintide and 2.4 mg semaglutide, and then maintained that dose for 32 weeks.

39.    On August 22, 2022, Novo announced the completion of its Phase II CagriSema trial.  The Company stated that people treated with CagriSema "achieved a numerically higher body weight reduction of 15.6% compared to a reduction of 5.1% for people treated with semaglutide and 8.1% with cagrilintide alone."  Novo also announced that REDEFINE 1 – the CagriSema Phase III clinical trial – was expected to begin in the fourth quarter of 2022.

F.    The REDEFINE 1 Study

40.    On November 2, 2022, Novo filed a Form 6-K that described the REDEFINE 1 study plan, the CagriSema Phase III trial.  Novo's description represented that participants in the CagriSema arm of the study would receive a fixed dose of "2.4 mg semaglutide and 2.4 mg cagrilintide."  The dosing protocol included four participant arms with set doses of their assigned drug.  Study participants

- 18 -

received either a fixed dose of CagriSema (2.4 mg cagrilintide and 2.4 mg semaglutide), 2.4 mg of cagrilintide, 2.4 mg of semaglutide, or 2.4 mg of the placebo. Novo also stated that participants in the CagriSema arm would receive the fixed-dose combination once weekly over 52 weeks, following a 16-week dose escalation phase.

41.    Throughout the Class Period, Defendants informed investors that it expected CagriSema to be well tolerated and cause 25% weight loss.  Defendants told investors that these representations were based on "data derived from [Novo's prior] Phases I and II" studies, which were shorter and used fixed dosing.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

42.    During the Class Period, Defendants made numerous false and misleading statements, omitted material facts necessary to make their statements not misleading, or failed to disclose adverse facts related to CagriSema and Novo's REDEFINE 1 trial, including: (a) the REDEFINE 1 dosing protocol; (b) CagriSema's tolerability; and (c) CagriSema's expected weight loss based on the results from Phases I and II.

43.    On November 2, 2022, Novo published a Form 6-K that included its Q3 2022 financial report.  The Form 6-K described the Individual Defendants as members of "Executive Management" who reviewed and approved the contents of the SEC filing.  The Form 6-K stated:

- 19 -

***REDEFINE 1 is a 68-week trial comparing the efficacy and safety of once-weekly CagriSema (2.4 mg semaglutide and 2.4 mg cagrilintide) with semaglutide 2.4 mg, cagrilintide 2.4 mg and placebo***.  The trial is expected to enrol[l] approximately 3,400 people with overweight or obesity.   REDEFINE 1 is the first pivotal trial in the REDEFINE program[].

44.     During the Q3 2022 earnings call that same day, Defendants presented slides from a deck entitled "Investor presentation First nine months of 2022."  The presentation included the following slide depicting the "2.4 mg/2.4 mg" dosing of CagriSema:



45.     On November 2, 2022, Novo also published an update to the REDEFINE 1 study record on ClinicalTrials.gov.  The update described the dosing in REDEFINE 1 as follows:

Experimental: ***Cagri[S]ema s.c. 2.4 mg/2.4 mg***

> ***Participants will receive 2.4 mg cagrilintide and 2.4 mg semaglutide once-weekly after a dose escalation period of 16 weeks*** (0.25 mg of cagrilintide and 0.25 mg of semaglutide from weeks 0-4, 0.5 mg of cagrilintide and 0.5 mg of semaglutide from weeks 5-8, 1 mg of cagrilintide and 1 mg of semaglutide from weeks 9-12 and 1.7 mg of cagrilintide and 1.7 mg of semaglutide from weeks 13-16) ***during the maintenance period for 52 weeks in the main phase***. Participants randomised to this arm will be included in the extension phase for 97 weeks.

46.     Defendants' statements in ¶¶43-45 above each concern the REDEFINE 1 dosing protocol. Each of the statements depicting the REDEFINE 1 CagriSema dosing protocol as 2.4 mg cagrilintide and 2.4 mg semaglutide are false and misleading because Defendants failed to disclose:

(a)     As Defendants admitted in December 2024, Novo designed the REDEFINE 1 protocol to include flexible dosing, which allowed study participants to modify their CagriSema dosage at any time during the 52-week main phase of the trial. Thus, REDEFINE 1 did not require a once-weekly dose of CagriSema at 2.4 mg of cagrilintide and 2.4 mg of semaglutide, as participants were allowed to personalize their dose of CagriSema. Ultimately, less than 60% of the participants actually received CagriSema as Defendants described, *i.e.*, a fixed dose of 2.4 mg cagrilintide and 2.4 mg semaglutide.

(b)     As Defendants later admitted during a conference call on February 5, 2025, but knew at the time of the November 2, 2022 statements, the dosing protocol actually allowed for flexible "individual dose titration." Defendants further admitted

that Novo intentionally used a flexible dosing protocol in response to tolerability data Novo developed in its prior Phase I and Phase II CagriSema trials.

47. Before Defendants corrected the false and misleading statements reflected in ¶¶43-45, Jørgensen and Lange sold Novo Class B shares, as detailed in ¶¶117-123. Each time Jørgensen or Lange sold Novo Class B shares, he violated his duty to abstain from insider selling while in possession of material, non-public information.

48. On November 3, 2022, Novo conducted a second Q3 2022 earnings call. During the call, Lange engaged in the following colloquy with a UBS Investment Bank analyst:

> [Michael Leuchten:] . . . And then on CagriSema, the tolerability in the Phase II, I think, at – it was 60-something percent of tolerability and I think discontinuation is up to 20%. Lilly has managed to get that down in Phase III. ***Just wondering what you can do in Phase III to get a better tolerability***.

> [Lange:] So super questions. First of all, (inaudible) tolerability shows a function of titration in this space. So that would go to both of your questions. ***Specifically on going to higher doses, we're actually following our normal step of more or less doubling the dose. We've shown that we can do that without introducing more tolerability issues. And based on what we know already now, we feel confident that these call them step increases will not introduce more tolerability issues than what we've seen***. Obviously, we have to show that. That's why we do the clinical trials. But our assumption is that when we get to that level, tolerability has already been built, and you can actually do the next step without introducing more GI side effects.

- 22 -

49.    Lange's response to the question about reducing CagriSema's tolerability issues in Phase III was false and misleading because:

(a)    Although Lange was specifically asked "what you can do in Phase III to get a better tolerability," Lange answered without revealing that Novo had designed REDEFINE 1 to include flexible dosing from its outset to address tolerability issues observed in CagriSema's Phases I and II trials.  As Defendants admitted on February 5, 2025, "[d]ose modifications were allowed throughout [REDEFINE 1]," "[p]eople were allowed to modify dose," and "[p]eople were allowed to stay at a tolerated dose."

(b)    Lange left out a material aspect of the titration procedure he described.  Specifically, Lange said "based on what we know already now, we feel confident . . . step increases will not introduce more tolerability issues than what we've seen," but Lange failed to disclose that his confidence came from the fact that he knew participants could modify their CagriSema dosage whenever it was not tolerable.  Thus, tolerability would not be an issue because patients could simply reduce their dosage and remain in the study.

50.    Before Defendants corrected the false and misleading statements reflected in ¶48, Jørgensen and Lange sold Novo Class B shares, as detailed in ¶¶117-123.  Each time Jørgensen or Lange sold Novo Class B shares, he violated his duty to abstain from insider selling while in possession of material, non-public information.

51.    On November 10, 2022, Novo published another update to the REDEFINE 1 study's entry on ClinicalTrials.gov.  In that update, Novo stated that "[p]articipants will receive 2.4 mg cagrilintide and 2.4 mg semaglutide once-weekly . . . for 52 weeks in the main phase" of the trial.  Subsequently, Novo issued that same REDEFINE 1 dosing statement 28 times in updates to the ClinicalTrials.gov database on: November 23, 2022; December 5, 2022; January 4, 2023; January 23, 2023; January 24, 2023; February 3, 2023; February 5, 2023; February 17, 2023; February 20, 2023; March 23, 2023; June 30, 2023; October 26, 2023; November 6, 2023; November 9, 2023; December 5, 2023; December 20, 2023; February 16, 2024; March 2, 2024; March 6, 2024; April 8, 2024; May 1, 2024; May 23, 2024; July 16, 2024; August 19, 2024; September 20, 2024; October 22, 2024; November 20, 2024; and December 15, 2024.

52.    On February 1, 2023, Novo hosted its FY 2022 earnings call and presented slides from a deck entitled "Investor presentation Full year 2022."  The presentation included a slide that depicted dosing of "2.4 mg/2.4 mg" for participants taking CagriSema in REDEFINE 1:



53.     On May 4, 2023, Novo hosted its Q1 2023 earnings call and presented slides from a deck entitled "Investor presentation First three months of 2023." The presentation included a slide that depicted dosing of "2.4 mg/2.4 mg" for participants taking CagriSema in REDEFINE 1:



54.    On August 10, 2023, Novo hosted its Q2 2023 earnings call and presented slides from a deck entitled "Investor presentation First six months of 2023." The presentation included a slide that depicted dosing of "2.4 mg/2.4 mg" for participants taking CagriSema in REDEFINE 1:



55.    On November 2, 2023, Novo hosted its Q3 2023 earnings call and presented slides from a deck entitled "Investor presentation First nine months of 2023."  The presentation included a slide that depicted dosing of "2.4 mg/2.4 mg" for participants taking CagriSema in REDEFINE 1:



56.    On January 31, 2024, Novo hosted its FY 2023 earnings call and presented slides from a deck entitled "Investor presentation Full year 2023." The presentation included a slide that depicted dosing of "2.4 mg/2.4 mg" for participants taking CagriSema in REDEFINE 1:



57.    Defendants' statements in ¶¶51-56 above each concern the REDEFINE 1 dosing protocol.  Each of the statements depicting the REDEFINE 1 CagriSema dosing protocol as 2.4 mg cagrilintide and 2.4 mg semaglutide are false and misleading because Defendants failed to disclose:

(a)    As Defendants admitted in December 2024, Novo designed the REDEFINE 1 protocol to include flexible dosing, which allowed study participants to modify their CagriSema dosage at any time during the 52-week main phase of the trial.  Thus, REDEFINE 1 did not require a once-weekly dose of CagriSema at 2.4 mg of cagrilintide and 2.4 mg of semaglutide, as participants were allowed to personalize their CagriSema dosage.  Ultimately, less than 60% of the participants actually

- 29 -

received CagriSema as Defendants described, *i.e.*, a fixed dose of 2.4 mg cagrilintide and 2.4 mg semaglutide.

(b)    As Defendants later admitted during a conference call on February 5, 2025, but knew at the time each of the statements in ¶¶51-56 were made, the dosing protocol actually allowed for flexible "individual dose titration." Defendants further admitted that Novo intentionally used a flexible dosing protocol in response to tolerability data Novo developed in its prior Phase I and Phase II CagriSema trials.

58.    Before Defendants corrected the false and misleading statements reflected in ¶¶51-56, Jørgensen and Lange sold Novo Class B shares, as detailed in ¶¶117-123. Each time Jørgensen or Lange sold Novo Class B shares, he violated his duty to abstain from insider selling while in possession of material, non-public information.

59.    On March 7, 2024, the Company hosted its Capital Markets Day for analysts and investors. During his opening statement, Lange said:

> My next [love] is obviously CagriSema. You've seen the data a couple of times in obesity. We know that it holds great potential. ***At least 25% weight loss with a safety and tolerability profile that in Phase I/II was similar to that [of Wegovy.] So we get more bang for the buck, so to speak, without having to compromise on safety and tolerability***. If we can show that in Phase III, that's really going to be a game changer.

60.    Lange's statement that "At least 25% weight loss with a safety and tolerability profile that in Phase I/II was similar to that [of Wegovy.] So we get more

bang for the buck, so to speak, without having to compromise on safety and tolerability" was false and misleading because Lange failed to disclose:

(a)    Novo designed REDEFINE 1 to include flexible dosing to address tolerability issues observed in CagriSema's Phases I and II trials.

(b)    The 25% weight loss and safety and tolerability profile expectations were based on results from Phase I and Phase II trials with fundamentally different dosing protocols than REDEFINE 1. Defendants failed to explain that, unlike Phases I and II, REDEFINE 1 was designed to utilize a flexible dosing protocol to address known tolerability issues, allowing participants to conduct "personal titration." Defendants knowingly withheld this material difference in the dosing protocols when providing investors with REDEFINE 1 expectations and informing investors that those expectations were based on Phase I and Phase II data. This omission left investors materially uninformed and unable to properly assess Lange's statements regarding CagriSema's expected performance in REDEFINE 1.

61.    Before Defendants corrected the false and misleading statements reflected in ¶59, Jørgensen and Lange sold Novo Class B shares, as detailed in ¶¶117-123. Each time Jørgensen or Lange sold Novo Class B shares, he violated his duty to abstain from insider selling while in possession of material, non-public information.

62.    During the March 7, 2024 Capital Markets Day conference call, Lange also engaged in the following colloquy with a Morgan Stanley securities analyst:

[Mark Douglas Purcell:] Martin, could you help us understand how you move the physician and payer audience from weight loss to outcomes. And in your CagriSema comments, you talked about using, looking at lower doses of CagriSema, whereas you're looking at high doses of semaglutide 7.2 milligram with pivotal data later this year. So can you help us understand the sort of dose effect in terms of, obviously, weight but quality of weight, CV factors, inflammation, triglycerides, et cetera?

[Lange:] ***So I don't think I said lower doses for CagriSema. Currently, we are investigating 2.4 milligram plus 2.4 milligram***. And we actually see a potential if the 7.2 milligram of semaglutide pans out to go into even the higher doses with CagriSema in the life cycle management space.

So we are investigating everything. ***But currently, we see the maximum benefit on weight loss on, glycemic control, but certainly also on the cardiovascular biomarkers on the doses that we picked for PHASE III, so 2.4 milligram and 2.4 milligram***. I think specifically to your first question, we only allow 1 question but then 1 (inaudible) Communication sharing of data. We're super happy with the publications that will get out, but also more specifically, the guideline updates and the regulatory updates that, that will entail. It will enable our medical communication, but also when we get the regulatory updates on our commercial communication.

63.    Lange's statements that "[s]o I don't think I said lower doses for CagriSema . . . we are investigating 2.4 milligram plus 2.4 milligram" and "we picked . . . 2.4 milligram and 2.4 milligram" were false and misleading because Lange failed to disclose:

(a)    As Defendants admitted in December 2024, Novo designed the REDEFINE 1 protocol to include flexible dosing, which allowed study participants to modify their CagriSema dosage at any time during the 52-week main phase of the trial. Thus, REDEFINE 1 did not require a once-weekly dose of CagriSema at 2.4 mg

- 32 -

of cagrilintide and 2.4 mg of semaglutide, as participants were allowed to personalize their dose of CagriSema.   Ultimately, less than 60% of the participants actually received CagriSema as Defendants described, *i.e.*, a fixed dose of 2.4 mg cagrilintide and 2.4 mg semaglutide.

(b)    As Defendants later admitted during a conference call on February 5, 2025, but knew at the time of the March 7, 2024 statement, the dosing protocol actually allowed for flexible "individual dose titration."  Defendants further admitted that Novo intentionally used a flexible dosing protocol in response to tolerability data Novo developed in its prior Phase I and Phase II CagriSema trials.

64.    Before Defendants corrected the false and misleading statements reflected in ¶62, Jørgensen and Lange sold Novo Class B shares, as detailed in ¶¶117-123.  Each time Jørgensen or Lange sold Novo Class B shares, he violated his duty to abstain from insider selling while in possession of material, non-public information.

65.    During Novo's March 7, 2024 Capital Markets Day, Defendants presented slides from a deck entitled "Diabetes care."  The presentation included the following slide stating that Novo's Phase III clinical studies of CagriSema, which included REDEFINE 1, tested a "fixed dose combination" (or "FDC") of semaglutide and cagrilintide:



66.    Defendants' statement that the REDEFINE study program tested CagriSema, described as "sema and cagri FDC" in a "fixed dose combination" (*i.e.*, 2.4 mg cagrilintide and 2.4 mg semaglutide) was false and misleading because Defendants failed to disclose:

(a)    REDEFINE 1 did not use a "fixed dose combination," as Defendants described.  Defendants admitted in December 2024 that Novo designed the REDEFINE 1 protocol to include flexible dosing, which allowed study participants to modify their CagriSema dosage at any time during the 52-week main phase of the trial.  Thus, REDEFINE 1 did not use a "fixed dose combination" of CagriSema, as participants were allowed to personalize their dosage.  Ultimately, less

than 60% of the participants actually received CagriSema as Defendants described, *i.e.*, a fixed dose of 2.4 mg cagrilintide and 2.4 mg semaglutide.

(b)    As Defendants later admitted during a conference call on February 5, 2025, but knew at the time of the March 7, 2024 statement, the dosing protocol actually allowed for flexible "individual dose titration."  Defendants further admitted that Novo intentionally used a flexible dosing protocol in response to tolerability data Novo developed in its prior Phase I and Phase II CagriSema trials.

67.    Before Defendants corrected the false and misleading statements reflected in ¶65, Jørgensen and Lange sold Novo Class B shares, as detailed in ¶¶117-123.  Each time Jørgensen or Lange sold Novo Class B shares, he violated his duty to abstain from insider selling while in possession of material, non-public information.

68.    Novo also presented slides from a deck entitled "Obesity care" during its March 7, 2024 Capital Markets Day.  The presentation included the following slide, which stated that Novo was considering "future trials" of CagriSema to "[e]valuate lower doses for personali[z]ed treatment":



69.    On May 2, 2024, Novo hosted its Q1 2024 earnings call and presented slides from a deck entitled "Investor presentation First three months of 2024."  The presentation included the following slide, which stated that Novo was considering "future trials" of CagriSema to "[e]valuate lower doses for personali[z]ed treatment":



70.     On August 7, 2024, Novo hosted its Q2 2024 earnings call and presented

slides from a deck entitled "Investor presentation First six months of 2024."  The

presentation included the following slide, which stated that Novo was considering

"future trials" of CagriSema to "[e]valuate lower doses for personali[z]ed treatment":



71.    Defendants' statements in ¶¶68-70 above regarding "[p]otential future trials" of CagriSema within obesity that would "[e]valuate lower doses for personali[z]ed treatment" were misleading because Defendants failed to disclose:

(a)    As Defendants admitted in December 2024, Novo designed the REDEFINE 1 to include flexible dosing, which allowed study participants to modify their dosage of CagriSema at any time during the 52-week main phase of the trial.

(b)    Novo was already investigating "lower doses for personali[z]ed treatment" of CagriSema in its REDEFINE 1 study at the time each of the statements in ¶¶68-70 were made. As Defendants later admitted on February 5, 2025 but knew at the time each of the statements in ¶¶68-70 were made, REDEFINE 1 was designed to evaluate CagriSema at personalized doses to accommodate participants lowering their

dosage due to tolerability concerns, which Defendants later described as "close" to "personal titration" or "individual dose titration."

72.    Before Defendants corrected the false and misleading statements reflected in ¶¶68-70, Jørgensen and Lange sold Novo Class B shares, as detailed in ¶¶117-123.  Each time Jørgensen or Lange sold Novo Class B shares, he violated his duty to abstain from insider selling while in possession of material, non-public information.

73.    Novo hosted a conference call on November 6, 2024 to discuss Q3 2024 earnings.  During the call, Lange engaged in the following colloquy with an analyst at Bernstein:

> [Florent Cespedes:] First for Martin on CagriSema.  I know that everybody is focused on weight loss.  But Martin, could you share with us what kind of tolerance profile you're looking for this product as based on sales data from diabetes patients.
>
> We see that there is increased efficacy on weight loss, but also in this level of nausea or gastrointestinal adverse event with the combination of CagriSema versus the individual component.  So could you share with us what kind of level of side effects had effects you're all looking for?  Will it be the same vein as mantra or higher?
>
> *                    *                    *
>
> [Lange:] Yes.  Thank you very much for that question.  As we just discussed, these are still early days.  ***We are still basing all of our assumptions on data derived from Phases I and II.  Based on what we know and based on how we understand the biology, as you said yourself, we expect to see really unsurpassed weight loss***.
>
> At this point in time, we expect to see good glycemic control in type 2 diabetes together with a strong weight loss.  ***And based on what***

***we've seen so far, that will come with a safety and tolerability profile
broadly in line with what we see with GLP-1 treatment***.

74.    Lange's statements that, based on Novo's observations from the Phase I
and Phase II CagriSema studies, the Company expected "to see really unsurpassed
weight loss" and that it would "come with a safety and tolerability profile broadly in
line with what we see with GLP-1 treatment" were false and misleading because
Lange failed to disclose that:

(a)    Novo designed REDEFINE 1 to include flexible dosing to address
tolerability issues observed in CagriSema's Phase I and Phase II trials.

(b)    The 25% weight loss and safety and tolerability profile
expectations were based on results from Phase I and Phase II trials with fundamentally
different dosing protocols than REDEFINE 1.  Defendants failed to explain that,
unlike Phases I and II, REDEFINE 1 was designed to utilize a flexible dosing protocol
to address known tolerability issues, allowing participants to conduct "personal
titration."  Defendants knowingly withheld this material difference in the dosing
protocols when providing investors with REDEFINE 1 expectations and informing
investors that those expectations were based on Phase I and Phase II data.  This
omission left investors materially uninformed and unable to properly assess Lange's
statements regarding CagriSema's expected performance in REDEFINE 1.

75.    On November 6, 2024, Novo hosted its Q3 2024 earnings call and
presented slides from a deck entitled "Investor presentation First nine months of

- 40 -

2024." The presentation included the following slide, stating that Novo was considering "future trials" of CagriSema to "[e]valuate lower doses for personali[z]ed treatment":



76. Defendants' statement regarding "[p]otential future" CagriSema trials within obesity that would "[e]valuate lower doses for personali[z]ed treatment" was misleading because Defendants failed to disclose:

(a)     As Defendants admitted in December 2024, Novo designed REDEFINE 1 to include flexible dosing, which allowed study participants to modify their dosage of CagriSema at any time during the 52-week main phase of the trial.

(b)     Novo was already investigating "lower doses for personali[z]ed treatment" of CagriSema in its REDEFINE 1 study at the time the November 6, 2024

statement was made. As Defendants later admitted on February 5, 2025 but knew at the time the November 6, 2024 statement was made, the REDEFINE 1 dosing protocol was already evaluating CagriSema at personalized doses to accommodate participants lowering their dosage due to tolerability concerns, which Defendants later described as "close to" "personal titration" or "individual dose titration."

77.    The next day, on November 7, 2024, Novo hosted a second conference call to discuss Q3 2024 earnings. During the call, Lange engaged in the following dialogue with an analyst at Redburn Atlantic:

[Simon Baker:] And then on CagriSema, one of the things that cropped up in the Phase 1 and didn't seem to be a particular issue was the presence of antidrug antibodies, neutralizing antibodies. Firstly, is that anything to worry about? And secondly, how does that factor into your modeling of the 25% weight loss that you expect for the REDEFINE study? Thanks so much.

*    *    *

[Lange:] On the antibodies, I'm not aware of many, if any, injectable proteins or peptides that do not induce antibodies. The trigger is to assess whether it has any clinical bearing on either efficacy or safety with CagriSema, with cagrilintide.

And we have quite a lot of data at this point in time. Some forget that we have already done Phase 2 for cagrilintide in monotherapy. And in that, we saw no impact of neither efficacy or safety variables. ***That also means then when we look at our model, that has actually been factored in, because the model is based on the clinical response in Phases 1 and 2, and that lands us nicely at the 25% mark***.

78.    Lange's statement that, based on Novo's data from Phase I and Phase II CagriSema studies, the Company expected to land "nicely at the 25% mark" was false and misleading when it was made because Lange failed to disclose that:

(a)    Novo designed REDEFINE 1 to include flexible dosing to address tolerability issues observed in CagriSema's Phase I and Phase II trials.

(b)    The 25% weight loss and safety and tolerability profile expectations were based on results from Phase I and Phase II trials with fundamentally different dosing protocols than REDEFINE 1.  Defendants failed to explain that, unlike Phases I and II, REDEFINE 1 was designed to utilize a flexible dosing protocol to address known tolerability issues, allowing participants to conduct "personal titration."  Defendants knowingly withheld this material difference in the dosing protocols when providing investors with REDEFINE 1 expectations and informing investors that those expectations were based on Phase I and Phase II data.  This omission left investors materially uninformed and unable to properly assess Lange's statements regarding CagriSema's expected performance in REDEFINE 1.

## VI.    THE TRUTH IS REVEALED

79.    On December 20, 2024, Novo finally revealed REDEFINE 1's flexible dosing protocol while releasing limited results from the trial.  In a Company press release, Novo informed the public that "[t]he REDEFINE 1 trial was based on a flexible protocol, allowing patients to modify their dosing throughout the trial."

- 43 -

According to the announcement, at the end of the trial, only 57.3% of patients were treated with the previously described CagriSema fixed dosage – a combination of 2.4 mg cagrilintide and 2.4 mg semaglutide.

80.    Defendants also acknowledged that CagriSema failed to meet Novo's expected 25% weight loss.  Defendants presented the REDEFINE 1 results in terms of two separate "estimand[s]," which are theoretical quantities obtained using statistical estimations.  First, Novo provided a "trial product estimand" which it defined as the amount of weight loss participants *would* have received in the hypothetical scenario where "all people adhered to treatment."  For this value, Novo reported 22.7% weight loss, well below the 25% target.  When applying the "treatment policy estimand," which estimates the "treatment effect regardless of treatment adherence," CagriSema patients achieved only 20.4% weight loss, falling well short of Lilly's 22.5% benchmark for Zepbound.

81.    Securities analysts responded negatively to the REDEFINE 1 news, with many expressing surprise and concern about the previously undisclosed flexible dosing protocol and the related tolerability implications.  Analysts also attributed the lower than expected efficacy results to dosing and tolerability.  Analyst reactions included the following:

- *-22.7% looks weak, but what did we learn*?, ABG Sundal Collier, December 20, 2024:

"However ***the main problem was the flexible trial protocol*** which allows patients to adjust its dosing (ie similar to real-word usage), which patients did before progressing to the highest dose. . . . The unclear patient data sees Novo committing to further trials to evaluate the dosing. In light of the unexpectedly large flexible-dosing effects do we expect the true test for CagriSema to be the head-to-head data with Tirzepatide in H1'25."

- *Coal for Christmas – CagriSema Underperforms Expectations in REDEFINE*, BMO Capital Markets (December 20, 2024):

  "***Limits for patients attempting to reach the maximum dose raise questions around tolerability***. While Novo noted that CagriSema was safe and well tolerated with mild to moderate gastrointestinal side effects, we expect some of these moderate side effects may have prevented patients from stepping up doses faster or may have resulted in down titrations, again limiting efficacy slightly. We look to the full data presentation to understand these dynamics better."

- *CagriSema: not the present we were hoping for*, Deutsche Bank, December 20, 2024:

  "Baseline of 107kg appears uneventful and ***it appears tolerability is the issue here***, because only 57% of CagriSema patients are reported as adhering to the highest dose vs 83% for cagri and 70% for sema. That should translate into reasonable safety details when we get them (there are none today)."

- *Disappointing CagriSema data*, DNB Markets, December 20, 2024:

  "***Due to the flexible protocol, only 57.3% of patients were treated with the highest dose, in our view reducing efficacy and prompting Novo Nordisk to initiate a new phase III trial in 2025 (likely with a slower titration)***."

- *CagriSema Festive Shock as Weight Loss Falls Short & Tolerability Concerns*, Jefferies, December 20, 2024:

- 45 -

"First headline Phase III CagriSema obesity data disappoint with 20.4% absolute weight loss and patient adherence ***likely suggesting tolerability concerns, in our view***."

- *FAST TAKE*, UBS, December 20, 2024:

  "NEGATIVE: Weight loss only comparable to existing Lilly competitor, and as only 57% of patients got to highest dose vs 70% for sema arm, ***we see questions on tolerability***.

- *CagriSema Underperformed Investor Expectations; Comparable Weight Loss to Zepbound Though Tolerability Could Be Challenging*, William Blair, December 20, 2024:

  "In our view, the initial results from the Phase III REDEFINE 1 study underwhelmed compared with investor expectations both in terms of weight loss magnitude and tolerability.

  "In the Phase III REDEFINE 1 study, patients could modify drug dosing throughout the trial, which differed from the Phase III SURMOUNT-1 of Zepbound (only one dose reduction was permitted) or STEP 1 of Wegovy (all subjects aimed to reach the maximum 2.4 mg dose, though 1.7 mg was permitted)."

  "Novo did not outline detailed tolerability data in the press release, which makes direct comparison with Zepbound difficult. However, ***less than 6 out of 10 patients (57%) were able to titrate up to the highest dose for CagriSema versus 83% with cagrilintide or 70% with Wegovy, which in our view suggests a challenging tolerability profile***. We argue that the tolerability component is the major driver for investors' bearish take on REDEFINE 1 since the most significant unmet medical need in the obesity space is the ability to maintain patient adherence to GLP-1-based therapies."

- *Blue Christmas: reduce PT to DKK 900 as expect Street to use lower multiple until we have more info*, Barclays, December 23, 2024:

  "[I]n the clinical trial setting, titration is done on a forced schedule in order to maximize efficacy. ***Did Novo design the trial this way***

*to avoid potential tolerability issues*?  These are questions we need answered by the company."

82.    The media also questioned the newly revealed flexible dosing protocol

and outcomes:

- *Novo's CagriSema Blunder Underscores Shy-High Investor Expectations for Weight Loss Drugs*, BioSpace, December 20, 2024:

  "***An interesting aspect of Novo's trial was its flexible dosing schedule that allowed patients to modify their dosing as needed***.  Fewer than 6 out of 10 patients were able to reach the highest dose allowed in the study.  William Blair's analysts said this suggests 'a challenging tolerability profile.' . . .  'This kind of unforced error around multiple parts of trial design, setting the bar and basically creating a narrative that, now looking back, is impossible,' Seigerman said. . . .  ***The titration schedule did not create consistency in the study, Seigerman continued.  Because of it, Novo did not generate the data it needed to say with absolute certainty what CagriSema's best performance could be***."

- *An experimental drug drove people to lose 23% of their body weight.  It's still seen as a disappointment*, CNN, December 20, 2024:

  "***Only just more than half of participants got up to the highest dose of the drug, though, leading some to question if the combination may not be as tolerable at high doses***."

- *Novo Nordisk's dosing in CagriSema obesity trial puzzles investors*, Reuters, December 20, 2024:

  "Aside from the disappointing headline number, investors and analysts focused on another puzzling data point: only 57% of patients in the trial were on the highest dose-strength of the medicine at the end of the 68-week trial. . . .  ***It 'clearly means tolerability was an issue,' said Kevin Gade, portfolio manager at Bahl & Gaynor***.  He owns shares in Novo's top rival, Eli Lilly.

Alexander Jenke, a portfolio manager at Medical Strategy in Munich, and a Novo shareholder, agreed. He said there may have been higher rates of gastrointestinal adverse events such as nausea, vomiting, and diarrh[ea]."

83. On February 5, 2025, Novo hosted its FY 2024 earnings call and presented slides from a deck entitled "Investor presentation Full year 2024." The presentation revealed more of the truth concerning Novo's REDEFINE 1 dosing protocol, including information Defendants knew at the beginning of the Class Period. Defendants conceded that Novo intentionally implemented a flexible dosing protocol after observations from CagriSema's Phase I and Phase II trials and at least one reason for the flexible dosing was to keep patients at "a tolerated dose."



84.    During the Company's February 5, 2025 FY 2024 earnings call,
Defendants provided more information on REDEFINE 1.  Defendants discussed the
flexible dosing protocol and the reasons Novo implemented it.  Lange explained:

> Based on the CagriSema weight loss data observed in Phases 1 and 2
> trials, we incorporated a flexible protocol in REDEFINE 1.  The protocol
> followed a 16-week titration schedule and permitted dose modifications
> based on tolerability or concerns about excessive weight loss throughout
> the trial.  This was done to balance efficacy, tolerability, and trial
> dropout.

85.    During the question-and-answer portion of the February 5, 2025 earnings
call, securities analysts asked about the REDEFINE 1 flexible dosing protocol.  In
response, Lange described the protocol as being "close to" "personal titration,"
conceding that the study allowed patients "to do individual dose titration."

86.    In other words, Defendants designed REDEFINE 1 to utilize flexible
dosing to account for tolerability concerns observed during the Phase I and Phase II
trials but falsely told investors that CagriSema's use in REDEFINE 1 would be a
fixed-dose of 2.4 mg cagrilintide and 2.4 mg semaglutide.

87.    Defendants' comments only solidified concerns from investors and
analysts.  On February 5, 2025, an analyst from TD Cowen identified two problems
with the flexible dosing protocol – "1) weight loss superior to Zepbound may yet be
demonstrated in a different study but headline weight loss from REDEFINE 1 will be
on the label and could make it tougher to compete" and "2) GI tolerability might be an
issue but trial design precludes cross-trial comparison to Wegovy and Zepbound

- 49 -

benchmarks."  The TD Cowen analyst also stated that tolerability data from REDEFINE 1 could not be compared to tolerability data from the Wegovy STEP 1 fixed-dose trial, noting "the trial's flexible [dosing] protocol makes this a specious comparison.  The TD Cowen securities analyst concluded:

> "This might suggest that CagriSema tolerability may indeed have been a challenge, but GI AE rates did not climb higher because so many patients were allowed to remain at a lower dose.  Had REDEFINE 1 shared the same protocol as STEP 1, and patients been given the choice to titrate to the top dose or discontinue, it is not clear what the tolerability data would have shown.  This is a key unanswered – and in this trial, unanswerable – question."

88.    On February 5, 2025, a Barclays securities analyst shared the belief that the flexible dosing protocol made the REDEFINE 1 data difficult to analyze, stating "the flexible dosing protocol introduced a number of variables, making the drawing of further conclusions significantly more challenging."

89.    On February 7, 2025, a Deutsche Bank securities analyst attributed Novo investor trepidation to the fact that "R&D credibility questions persist after the [REDEFINE 1] headline miss . . . and were somewhat compounded by attempts to explain the result on Wednesday."  Deutsche Bank's securities analyst described the consequences of Novo's December 20, 2024 announcement as "the challenging combination of not telling the market in advance about the flexible protocol and focusing attention on the 25% hurdle."

## VII.   ADDITIONAL EVIDENCE OF SCIENTER

### A.     Defendants Admitted to Designing a Flexible Dosing Protocol Because of Tolerability Concerns

90.    Throughout the Class Period, Defendants repeatedly misrepresented the REDEFINE 1 dosing protocol, claiming that the CagriSema arm participants received a fixed combination of "2.4 mg semaglutide and 2.4 cagrilintide."  As late as November 6, 2024, Defendants continued to represent to investors that the CagriSema arm of REDEFINE 1 tested a fixed dose of 2.4 mg cagrilintide and 2.4 semaglutide. In a presentation on that date, the Company said that "future trials" would "[e]valuate lower doses," suggesting to investors that lower doses of CagriSema were not included in REDEFINE 1.

91.    Defendants made these representations until they announced the disappointing REDEFINE 1 results on December 20, 2024.  At that time, needing an explanation for CagriSema's much lower than expected weight loss, Defendants finally disclosed that REDEFINE 1 was "based on a flexible protocol, allowing patients to modify their dosing throughout the trial."  According to the Company, only "57.3% of patients treated with CagriSema were on the highest dose."  Until this time, investors did not know a range of CagriSema doses were being tested.  Instead, they understood that all participants receiving CagriSema were being treated with "the highest dose."

92.     Six weeks later, during the Company's February 5, 2025 Q4 2024 earnings call, Defendants provided more information about the flexible dosing protocol and the reasons Novo implemented it.  Specifically, Lange said:

> Based on the CagriSema weight loss data observed in Phase 1 and 2 trials, we incorporated a flexible protocol in REDEFINE 1.  The [trial] protocol followed a 16-week titration schedule and *permitted dose modifications based on tolerability* or concerns about excessive weight loss *throughout the trial*.  *This was done to balance efficacy, tolerability and trial dropout.*

Thus, the use of flexible dosing was decided prior to the beginning of the Class Period.

## B.    Defendants Disclosed Flexible Dosing Protocols in Other GLP-1 Trials

93.     In prior Novo clinical trials that utilized flexible dosing, the actual dosing protocol was described from the start.  For example, in the PIONEER 7 semaglutide trial that began in September 2016, the Company listed the "official title" of the study on ClinicalTrials.gov as "Efficacy and Safety of Oral Semaglutide *Using a Flexible Dose Adjustment* Based on Clinical Evaluation Versus Sitagliptin in Subjects With Type 2 Diabetes Mellitus."

## C.    Defendants Identified Lange as the Best Source of Information for CagriSema Trial Design

94.     Prior to and throughout the Class Period, Novo and its senior management team identified Lange as the "key person" authorized on Novo's behalf to answer important questions regarding the Company's clinical trial designs and

outcomes. Novo's senior management team explicitly deferred analyst and investor questions regarding clinical trial design and outcomes to Lange during earnings calls, investment banking conferences, and industry meetings.

95.    For example, on May 5, 2022, during Novo's Q1 2022 earnings call, a Jeffries analyst asked two questions – one involving dosing and the other regarding drug production. Novo's Chief Financial Officer, Karsten Knudson ("Knudson") responded to only the production question and deferred to Lange to answer about dosing: "Then, Martin [Lange], on same 2.4 patient profiles and in terms of need of the doses?" This type of hand-off to Lange repeatedly happened during public interactions with analysts and investors.

96.    On June 5, 2022, during the ADA's 2022 Scientific Session, Knudson introduced Lange as the Novo representative who would be involved in "most of the presentation today and who will be able to [answer] all the key questions around our clinical trial outcomes, design, . . . and so on."

97.    On May 4, 2023, during Novo's Q1 2023 earnings call, a BNP Paribas analyst asked a question involving Novo's supply chain along with another question regarding CagriSema's competiveness. Jørgensen answered the supply chain question and deferred to Lange about CagriSema's competiveness: "Thank you, Richard. I'll start a bit on the supply side, and then Martin can talk to probably CagriSema more than competition."

98.    On November 2, 2023, during Novo's Q3 2023 earnings call, a Morgan Stanley analyst asked about higher doses in GLP-1 trials, specifically the trials involving tirzepatide.  Daniel Bohsen ("Bohsen"), Novo's Corporate Vice President and Head of Investor Relations at the time, directed the question to Lange: "Martin, the third question for you, GLP-1 higher dose considerations."  Prior to responding to the substance of the question, Lange confirmed that he was the correct person to answer the question on behalf of the Company: "Yes, absolutely.  Thank you for that question.  So, you're absolutely right."  During a follow up call the next day, a Jefferies analyst asked a question about the Phase III CagriSema clinical trials and the pathway to regulatory approval.  Bohsen again directed the question to Lange: "Yes. Martin, that's one for you."

99.    On November 11, 2023, during the American Heart Association Conference, Bohsen introduced Lange as "Executive Vice President for Development, long career in Novo Nordisk, various positions and the last 3, 4 years, part of executive management and a key person in terms of running the clinical trials."

100.    During Novo's Q3 2024 earnings call on November 6, 2024, a BNP Paribas analyst asked about CagriSema and Novo's confidence in hitting 25% weight loss.  Jacob Martin Rode ("Rode"), Novo's Head of Investor Relations, directed the question to Lange, stating: "That goes to you, Martin, on the high level CagriSema expectations."  Later during the call, a Bernstein analyst asked a series of questions on

- 54 -

CagriSema tolerability and an update on midterm guidance. Rode again directed the questions to Lange: "Thank you for those two questions. Firstly, on Martin, if you could reiterate your previous tolerability commentary on CagriSema?"

101. After the initial REDEFINE 1 results were disclosed on December 20, 2024, Novo directed analyst questions pertaining to the trial results to Lange. For example, during Novo's Q4 2024 earnings call on February 5, 2025, a UBS Equities analyst asked a question about the REDEFINE 1 results. Rode directed the question to Lange: "On the first one, in terms of REDEFINE 1 data, we'll turn it to you, Martin." On the same call, a Berenberg analyst asked questions about patients titrating down during REDEFINE 1 and the future of Novo's amycretin studies. Rode once again directed the questions to Lange: "Thank you for those two questions, Luisa. I think both of them [are] for you, Martin, start with the first one. So on the data in REDEFINE 1." Lange proceeded to give a detailed response, indicating that he was the correct person to answer the question on behalf of the Company.

102. Lange likewise held himself out as an expert on the dosing protocol of REDEFINE 1, frequently answering securities analysts' questions on the topic. For example, during Novo's November 3, 2022 earnings call, Lange engaged in the following discussion with a UBS Investment Bank analyst:

> [Michael Leuchten:] Two questions for Martin, please. Just on the ultra-high dose sema in the Phase II, that's a step change in dose that's quite different from what you tried before. Just wondering where that came from to go that aggressive on the dose range? And then on CagriSema,

the tolerability in the Phase II, I think, at – it was 60-something percent of tolerability and I think discontinuation is up to 20%. Lilly has managed to get that down in Phase III. Just wondering what you can do in Phase III to get a better tolerability.

[Lange:] So super questions. First of all, (inaudible) tolerability shows a function of titration in this space. So that would go to both of your questions. Specifically on going to higher doses, we're actually following our normal step of more or less doubling the dose. We've shown that we can do that without introducing more tolerability issues. And based on what we know already now, we feel confident that these call them step increases will not introduce more tolerability issues than what we've seen. Obviously, we have to show that. That's why we do the clinical trials. But our assumption is that when we get to that level, tolerability has already been built, and you can actually do the next step without introducing more GI side effects.

103.  During Novo's June 26, 2023 R&D investor call, a Jeffries analyst asked "are you confident that the dosing you're using in the CagriSema trials is as high as you need to go or, I guess, what is the limiting factor that this looking? [sic]" Lange responded, "[o]n CagriSema, as you know, we tested the 2.4 milligram of Wegovy together with up to 4.5 milligrams of cagrilintide and did not see sort of a substantial up in terms of efficacy. And therefore, we decided on the 2.4 and the 2.4."

104.  Also during the June 26, 2023 investor call, Novo was asked if it was considering whether to develop "any data" that might support a strategy of allowing patients to lower their dose from 2.4 milligrams after achieving weight loss. Lange responded, "we'll be evaluating our options there," but said nothing about the fact that flexible dosing was already incorporated into the REDEFINE 1 and REDEFINE 2 protocols.

- 56 -

105.    During Novo's March 7, 2024 Capital Markets Day, Lange engaged in

the following discussion with a Morgan Stanley equity analyst:

> [Mark Douglas Purcell:] And in your CagriSema comments, you talked about using, looking at lower doses of CagriSema . . .

> [Lange:] So I don't think I said lower doses for CagriSema. Currently, we are investigating 2.4 milligram plus 2.4 milligram . . . . But currently, we see the maximum benefit on weight loss . . . on the doses we picked for Phase III, so 2.4 milligram and 2.4 milligram.

106.    Lange also held himself out as an expert on CagriSema and REDEFINE

1 generally, as demonstrated by further comments at Novo's March 7, 2024 Capital

Markets Day, where he stated the following:

> My next [love] is obviously CagriSema.  You've seen the data a couple of times in obesity.  We know that it holds great potential.  At least 25% weight loss with a safety and tolerability profile that in Phase I/II was similar to that [of Wegovy.]  So we get more bang for the buck, so to speak, without having to compromise on safety and tolerability.  If we can show that in Phase III, that's really going to be a game changer. We also discussed the potential obviously, on the cardiovascular system. We've seen more than additivity on some of the biomarkers for cardiovascular risk, blood pressure, dyslipidemia, but actually also inflammation.  And that holds a big, big potential for what CagriSema can do.

> We'll see the first readout from REDEFINE 1 later this year.  And as you can also see in the slide late this year.  That's going to be incredibly exciting.  That's our pivotal study.  It's a 26 – sorry, 68 weeks study in 3,400 patients.  And if I can use a proxy for future success of a molecule, it's typically – how easy is it to recruit into a trial?  We actually recruited these 3,400 patients several months prior to our schedule.

D.    **CagriSema Is a Core Product Crucial to Novo's Future**

107.    Starting in 2018, Novo and Lilly engaged in an intense arms race to find the most effective obesity drug and secure dominance in the obesity market.  Novo struck first with Ozempic and Wegovy, but in June 2022, Lilly countered with tirzepatide, which caused 22.5% weight loss in study participants, reflecting the best obesity trial results for a GLP-1 medication to date.

108.    Novo needed to answer, and CagriSema was Novo's next big weight loss drug and its best hope to sustain market dominance.  CagriSema needed to beat the 22.5% weight loss mark set by tirzepatide, and Novo and its executives repeatedly assured investors that CagriSema would do just that.  Even before the Class Period, Defendants stressed the importance of CagriSema.  In the Q2 2022 earnings call on February 2, 2022, Lange called CagriSema "a very important product in our pipeline with great potential."  During the Q3 2023 earnings call on November 3, 2023, a Morgan Stanley analyst asked Novo to address "where you see the biggest opportunity to drive high adoption" of GLP-1 drugs, and Lange immediately singled out CagriSema, which he said had "huge potential, both in terms of volume but also in terms of the impact we can make to patients."  At their Capital Markets Day on March 7, 2024, Lange stated that: "My next [love] is obviously CagriSema.  You've seen the data a couple of times in obesity.  We know that it holds great potential."  Lange continued: "We'll see the first readout from REDEFINE 1 later this year.  And as you

- 58 -

can also see in the slide late this year.  That's going to be incredibly exciting.  That's our pivotal study."

109.    Securities analysts echoed Novo's excitement and anxiously awaited results from REDEFINE 1, which they considered critical to the Company's financial future.  On April 13, 2023, a Credit Suisse analyst noted that "Novo is placing significant emphasis behind cagrisema as the main pipeline asset to sustain growth," and accordingly forecasted that CagriSema peak sales would exceed $11 billion on its own – nearly twice as much as Saxenda and Wegovy's 2023 sales combined.  As a Jeffries analyst stated in a June 26, 2023 report, an impressive performance by CagriSema was "a must to play a role in the next treatment wave" for obesity therapies.  And on July 4, 2023, a Berenberg analyst further noted that Novo's "reassuringly positive, detailed P2 CagriSema data in diabetes" was "critical."

### E.    Jørgensen's Abrupt and Suspicious Departure Supports Scienter

110.    On May 16, 2025, just months after announcing the devastating CagriSema results, Novo fired Jørgensen.  In a company announcement that day, Novo stated that Jørgensen's termination was "made in light of the recent market challenges Novo Nordisk has been facing, and the development of the company's share price since mid-2024."  In response to Jørgensen's termination, during the Company's May 16, 2025 conference call, a securities analyst from Danske Bank confronted Novo's Independent Chairman of the Board Helge Lund, asking: "if you

- 59 -

can give us more details on what exactly has driven this change right now because it seems like a very big thing." Lund responded that "the Board has determined that the best interest of the company to announce the change of a CEO today." The analyst also addressed the suspicious nature of the termination, saying:

> And I'm sure that many on this call that has covered Novo for over for a very long time. And the way we know Novo is that normally, you have patience when you're on the right track, and then you kind of let things move in the right direction once you have to select the right. So it just feels like there's something that's gone pretty wrong here.

111.   On May 16, 2025, an analyst from BMO Capital Markets noted that "'we can't help but feel that recent competitive positioning and misses on trials like CagriSema could have contributed'" to Jørgensen's sudden ouster.

**F.   Novo's Intra-Class Period Financings Incentivized Fraud**

112.   As demand for Ozempic and Wegovy rapidly increased, Novo struggled to meet that demand from a manufacturing standpoint. By the end of 2022, Novo faced severe supply constraints that it scrambled to address. The Company looked to acquire existing companies with robust manufacturing capabilities to help meet demand.

113.   In February 2024, Novo announced that it intended to make its first major acquisition since becoming the most valuable company in Europe. The Company agreed to purchase Catalent, Inc. – an American drug developer and manufacturer – for $16.5 billion. On May 14, 2024, Novo announced that it planned to finance the

acquisition, in part, by selling $5 billion worth of Eurobonds to investors across the globe.

114.    Novo's ability to raise the necessary capital through the bond offering depended on its ability to market and sell the bonds to the investing public.  The value of debt offerings depends upon the apparent long-term value of the issuer.  Defendants were thus incentivized to portray Novo as the future market leader in the obesity space.  The Company needed to convince investors that CagriSema was effective enough and tolerable enough to beat out competing drugs from Lilly and help Novo maintain its market share.  If Novo disclosed the known problems with CagriSema, then the bonds would be less valuable and harder to sell.

115.    Novo's strategy of concealment worked, and resulted in a tremendously successful sale of Eurobonds.  Bloomberg reported that "[h]igh investor demand drove spreads down approximately 30 basis points below the initial price targets[]" and "[t]he offering reeled in investor bids of more than €10.2 billion. . . ."

### G.    Pressure from Shareholders to Elevate Share Price Incentivized Fraud

116.    The Novo Nordisk Foundation ("NNF") is the majority shareholder at Novo, and holds 77% of the voting power.  Accordingly, NNF has significant influence over personnel decisions in Novo's c-suite, and can apply significant pressure to executives to perform in accordance with NNF's priorities.  During the Class Period, NNF was particularly focused on Novo's share price, applying pressure

to Novo's executives – including Jørgensen and Lange – to keep the share price elevated. Tellingly, after the REDEFINE 1 results caused Novo's share price to crash, NNF used its influence to oust Jørgensen as CEO in May 2025. At the time of his firing, Novo admitted that NNF forced Jørgensen's departure because of "the development of the company's share price since mid-2024."

### H.    Defendants' Insider Trading Incentivized Fraud

117.    The Individual Defendants capitalized on their fraudulent conduct by selling unusually large amounts of their holdings at suspicious times during the Class Period. The amount and timing of their sales supports a strong inference that they made the trades with knowledge of the alleged fraud and sought to capture Novo's artificially inflated trading price before the market learned of the concealed truth.

118.    During the Class Period, Jørgensen sold 215,900 Novo Class B shares, for $26,026,620 in proceeds. Jørgensen made the sales while he was certifying Novo's Forms 6-K and otherwise proliferating misleading statements regarding REDEFINE 1's dosing protocol. Jørgensen's sales reflect a 348% increase in sales over the 62,000 Novo Class B shares he sold from November 1, 2020 to November 2, 2022, the two-year period preceding the Class Period (the "Control Period").

119.    Additionally, Jørgensen made all of his Class Period sales on two particular trading days. First, he sold 36,260 Novo Class B shares for $5,054,879 in proceeds on February 1, 2023, the same day that Novo made a presentation to

investors that included a misleading slide detailing REDEFINE 1's "trial design." *Supra* ¶¶52, 57.

120.   Next, Jørgensen sold 179,930 Novo Class B shares for $20,971,742 on February 5, 2024 (this single trading day earned Jørgensen nearly four times his proceeds from all sales during the Control Period).   Again, the timing of these February 5, 2024 sales suspiciously aligns with an investor presentation on January 31, 2024 that falsely and misleadingly described the REDEFINE 1 protocol as "2.4 mg/2.4 mg." *Supra*, ¶¶56-57.

121.   Lange sold 33,000 Novo Class B shares for $3,628,215 in proceeds during the Class Period.  These sales took place while Lange was making confident public statements regarding the CagriSema trials.  Novo did not report any sales from Lange during the two years leading up to the Class Period.  Beyond the magnitude of these sales, their timing again indicates motive for engaging in fraudulent conduct.

122.   Lange conducted his Class Period sales across four trading days.  First, he sold 1,000 Novo Class B shares for $110,834 in proceeds on November 2, 2022, the first day of the Class Period and the day Novo published its Q3 2022 earnings, announcing REDEFINE 1's initiation and fixed-dosage structure. *Supra*, ¶¶43-46. Second, Lange sold 7,000 Novo Class B shares for $706,860 in proceeds on November 13, 2023, closely following a November 2, 2023 investor presentation restating the false REDEFINE 1 dosing protocol. *Supra*, ¶¶55, 57.

123.   Third, Lange sold 16,000 Novo Class B shares (nearly half the entire volume sold during the Class Period) generating $1,615,680 in proceeds on February 5, 2024.  Like the timing of previous sales, this sale followed a January 31, 2024 presentation that contained substantively identical information to the earnings call that initiated the Class Period. *Supra*, ¶¶56-57.  Finally, Lange sold 9,000 Novo Class B shares for $1,194,840 in proceeds on May 14, 2024.  This sale followed a May 2, 2024 investor presentation in which Novo shared slides that misleadingly suggested that lower doses of CagriSema would be investigated in future trials, without disclosing that flexible dosing had already been incorporated in REDEFINE 1. *Supra*, ¶¶69, 71.

## VIII.  LOSS CAUSATION

124.   Novo's ADRs are traded on the NYSE.  The underlying security for the ADRs is Novo Class B common shares, which trade on the NASDAQ Copenhagen exchange.  Each Novo ADR represents one Novo Class B common share.  The markets for both Novo's Class B common shares and Novo's ADRs were open, well-developed and efficient at all relevant times.  Throughout the Class Period, Novo ADRs traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other Class members purchased or otherwise acquired Novo ADRs

relying on the integrity of the market price for Novo ADRs and market information relating to Novo, CagriSema, and Novo's REDEFINE 1 clinical trial.

125.    Defendants' misrepresentations became apparent to the market through a December 20, 2024 disclosure.  Subsequent to the disclosure, the price of Novo ADRs immediately declined as the artificial inflation was removed from the market price of the securities, causing Plaintiffs and the Class substantial damage.  The share price decline was a direct and foreseeable consequence of the disclosure of the relevant truth Defendants concealed.

126.    Prior to the market opening on December 20, 2024, Novo reported the results of its REDEFINE 1 clinical trial.  For the first time since announcing the trial dosing protocol in November 2022, the Company announced that REDEFINE 1 utilized a flexible dosing protocol that allowed patients to modify their dosing throughout the trial.  Only 57% of patients treated with CagriSema were on the originally described dose (2.4 mg cagrilintide and 2.4 mg semaglutide) at the end of the trial.  Patients treated with CagriSema achieved a 20.4% weight loss.

127.    In response to this news, on December 20, 2024, the price of Novo ADRs collapsed $18.15 per share, or 17.83%, in a single day, and experienced abnormally high volume of over 53 million ADRs traded.  By contrast, on the same date, the S&P 500 Index increased 1.1% and Novo's peer group index, as identified in its 2024 annual report, increased 0.77%.

128.    Securities analysts were shocked to hear about the REDEFINE 1 flexible dosing protocol and its implications on CagriSema's efficacy and tolerability. According to the analysts, the flexible dosing protocol impacted the drug's efficacy, caused inconclusive results, and created serious concerns with CagriSema's tolerability.

129.    For example, a DNB Markets analyst stated: "Due to the flexible protocol, only 57.3% of patients were treated with the highest dose, in our view reducing efficacy and prompting Novo Nordisk to initiate a new phase III trial in 2025 (likely with a slower titration)."

130.    A BMO Capital Markets analyst also noted that:

> Flexible dosing resulted in only 57% of patients achieving the highest dose, likely blunting efficacy. . . .  While Novo noted that CagriSema was safe and well tolerated with mild to moderate gastrointestinal side effects, we expect some of these moderate side effects may have prevented patients from stepping up doses faster or may have resulted in down titrations, again limiting efficacy slightly.

131.    A William Blair analyst was even more pointed:

> *[L]ess than 6 out of 10 patients (57%) were able to titrate up to the highest dose for CagriSema versus 83% with cagrilintide or 70% with Wegovy, which in our view suggests a challenging tolerability profile. We argue that the tolerability component is the major driver for investors' bearish take on REDEFINE 1 since the most significant unmet medical need in the obesity space is the ability to maintain patient adherence to GLP-1-based therapies.*

- 66 -

132.  The media was also surprised by the flexible dosing protocol, the reasons for the flexible dosing protocol, and the underlying results the protocol caused.  A December 20, 2024 Reuters article stated the following:

> Aside from the disappointing headline number, investors and analysts focused on another puzzling data point: only 57% of patients in the trial were on the highest dose-strength of the medicine at the end of the 68-week trial. . . .  It 'clearly means tolerability was an issue,' said Kevin Gade, portfolio manager at Bahl & Gaynor.  He owns shares in Novo's top rival, Eli Lilly.  Alexander Jenke, a portfolio manager at Medical Strategy in Munich, and a Novo shareholder, agreed.  He said there may have been higher rates of gastrointestinal adverse events such as nausea, vomiting, and diarrh[ea].

## IX.    NO SAFE HARBOR

133.  The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

134.  None of the statements complained of herein were forward-looking statements.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

135.  To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the REDEFINE 1

dosing protocol and CagriSema's efficacy and tolerability.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Novo were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

136.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because, at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the false and misleading forward-looking statement was authorized and/or approved by an executive officer of Novo who knew that the statement was false or misleading when made.

## X.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

137.   Plaintiffs and members of the putative Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and the fraud-on-the-market doctrine because, at all relevant times, the market for Novo ADRs was open, efficient and well developed for the following reasons, among others:

(a)   Novo ADRs met the requirements for listing, and were listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

- 68 -

(b)     The price of Novo ADRs reacted promptly to the dissemination of new information regarding the Company.  Novo securities were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation.  The average daily trading volume for Novo ADRs during the Class Period was nearly four million securities, and the average weekly volume as a percentage of securities outstanding was approximately 4.5%;

(c)     As a regulated issuer, Novo filed periodic reports with the SEC and the NYSE;

(d)     Novo regularly communicated with public investors via established market-communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     Novo was followed extensively by the media and by numerous securities analysts employed by major brokerage firms who wrote analyst reports about Novo during the Class Period that were distributed to those brokerage firms' sales forces and certain customers.  Each of those reports was publicly available and entered the public marketplace.

138.   As a result of the foregoing, the market for Novo ADRs promptly digested current information regarding Novo from all publicly available sources and reflected such information in the price of Novo ADRs.  Under these circumstances, all purchasers of Novo ADRs during the Class Period suffered similar injury through their purchases at artificially inflated prices and the presumption of reliance applies.

139.   A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because some claims are also grounded on Defendants' material omissions.  Because this action involves Defendants' deliberate decision to withhold REDEFINE 1's flexible dosing protocol and the reasons for implementing the flexible protocol throughout the Class Period, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that a reasonable investor might consider the facts withheld important in making investment decisions.

## XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

140.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Novo ADRs during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Novo and their families and affiliates.

141.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of December 31, 2024, there were over 440 million Novo ADRs outstanding, owned by thousands of investors.

142.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)    Whether the price of Novo ADRs was artificially inflated;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    The extent of damage sustained by Class members and the appropriate measure of damages.

143.   Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

144.   Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

145.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.    Joinder of all Class members is impracticable.  In addition, the damage suffered by some individual Class members may be relatively small, so the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
### (Against All Defendants for Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

146.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

147.   This count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

148.   Defendants participated directly or indirectly in statements or omissions, including those in the preparation and/or issuance of Novo's quarterly and annual reports, SEC filings, press releases, and other documents, including statements made

to investors, securities analysts, and the media that were designed to influence the market for Novo ADRs. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CagriSema, REDEFINE 1, and Novo's business prospects.

149.    During the Class Period, Defendants made the false and misleading statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

150.    Defendants had actual knowledge of the false statements and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Novo's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

151.    During the Class Period, through the employment of manipulative and deceptive devices designed to defraud, the Individual Defendants sold over $29 million worth of Novo Class B shares to unknowing investors. As detailed above, in breach of their duties owed to Novo and Class members, the Individual Defendants possessed material, non-public information when they sold Novo securities, taking

- 73 -

advantage of their possession of material non-public Novo information to obtain millions of dollars of insider trading profits during the Class Period.

152.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Novo ADRs.  Plaintiffs and the Class would not have purchased the Company's ADRs at the prices they paid, or at all, had they been aware that the market prices for Novo ADRs had been artificially inflated by Defendants' fraudulent false and misleading statements.

153.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

154.   By virtue of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### (Violations of §20(a) of the Exchange Act
### Against All Defendants)

155.   Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

156.   During the Class Period, Defendants participated in and oversaw the operation and management of Novo, and conducted and participated, directly and indirectly, in the conduct of Novo's business affairs, including the development of CagriSema.

- 74 -

157.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Novo's operations, and to promptly correct any materially false or misleading public statements issued by Novo.

158.    The Individual Defendants acted as controlling persons of Novo within the meaning of §20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Novo, the Individual Defendants had the power and ability to control the actions of Novo and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

159.    Novo had the power to control and influence the Individual Defendants and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations.  By virtue of the foregoing, Novo had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of their public statements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED: July 2, 2025                SEEGER WEISS LLP
                                   CHRISTOPHER A. SEEGER
                                   CHRISTOPHER L. AYERS


                                        /s/ Christopher A. Seeger
                                   _____
                                        CHRISTOPHER A. SEEGER

- 76 -

55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 973/639-9100
cseeger@seegerweiss.com
cayers@seegerweiss.com

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
RYAN A. LLORENS
JEFFREY J. STEIN
SARAH A. FALLON
JEREMY W. DANIELS
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
ryanl@rgrdlaw.com
jstein@rgrdlaw.com
sfallon@rgrdlaw.com
jdaniels@rgrdlaw.com

Lead Counsel

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
ROBERT D. KLAUSNER
SEAN SENDRA
7080 NW 4th Street
Plantation, FL 33317
Telephone: 954/916-1202
bob@robertdklausner.com
sean@robertdklausner.com

4899-9815-3293.v2

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY  10271
Telephone: 212/652-3890
vpitta@pittalaw.com

Additional Counsel

4899-9815-3293.v2